# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | |
|---|---|
| GOVERNMENT OF GUAM,<br><br>       Plaintiff,<br><br>       v.<br><br>THE 3M COMPANY; TYCO FIRE PRODUCTS LP; CHEMGUARD, INC.; BUCKEYE FIRE EQUIPMENT COMPANY; KIDDE-FENWAL, INC.; NATIONAL FOAM, INC.; E.I. DU PONT DE NEMOURS AND COMPANY; THE CHEMOURS COMPANY; ARKEMA, INC.; AGC CHEMICALS AMERICAS, INC.; DYNAX CORPORATION; CLARIANT CORPORATION; DUPONT DE NEMOURS, INC.; and CORTEVA, INC.,<br><br>       Defendants. | MDL No. 2873<br><br>Master Docket No. 2:18-mn-2873<br><br>Judge Richard Mark Gergel<br><br>Civil Action No. 2:19-cv-03602-RMG<br><br>FIRST AMENDED COMPLAINT WITH JURY DEMAND |

## FIRST AMENDED COMPLAINT

Plaintiff, Government of Guam ("Guam"), by and through Leevin T. Camacho, Attorney General of Guam ("Attorney General"), hereby files this First Amended Complaint pursuant to Case Management Order No. 3D and E, *In re: Aqueous Film-Forming Foams Products Liability Litigation*, 2:18-mn-02873-RMG (D.S.C.) against Defendants THE 3M COMPANY; TYCO FIRE PRODUCTS LP; CHEMGUARD, INC.; BUCKEYE FIRE EQUIPMENT COMPANY; KIDDE-FENWAL, INC.; NATIONAL FOAM, INC.; ARKEMA, INC.; AGC CHEMICALS AMERICAS, INC.; DYNAX CORPORATION; CLARIANT CORPORATION; E.I. DU PONT DE NEMOURS AND COMPANY; THE CHEMOURS COMPANY (collectively, "Manufacturer Defendants"); DUPONT DE NEMOURS, INC.; and CORTEVA, INC. (collectively with Manufacturer Defendants, "Defendants").

## INTRODUCTION

1.      Guam brings this civil action against Manufacturer Defendants pursuant to the common law of Guam and the public nuisance statute for injuries to natural resources of Guam, including groundwater, as a result of releases of perfluorooctane sulfonic acid ("PFOS") and perfluorooctanoic acid ("PFOA") into the environment due to the storage, handling, use, training with, testing equipment with, other discharges, and disposal of aqueous film-forming foam ("AFFF").  PFOS and PFOA are two persistent, bioaccumulative, and toxic substances within the class of man-made chemicals known as per- and polyfluoroalkyl substances ("PFAS").  Manufacturer Defendants in this case include manufacturers of AFFF, as well as the manufacturers of the PFAS-containing fluorochemicals and fluorosurfactants used to make AFFF (collectively, "AFFF Products").  Manufacturer Defendants' AFFF Products were used in Guam, causing natural resources to be contaminated with PFOS and PFOA.

2.      Additionally, Guam brings this action pursuant to the Deceptive Trade Practices – Consumer Protection Act, 5 GCA Sec. 32101–32807, as Manufacturer Defendants engaged in false, misleading, and deceptive acts and practices in advertising and selling AFFF Products to Guam.  Guam purchased and used these AFFF Products in performance of important public services, but was deceived by Manufacturer Defendants about the risks posed by AFFF Products, and was left by Manufacturer Defendants to deal with the consequences.  Among other things, this action seeks full restitution for Guam related to these purchases.

3.      AFFF is used to fight liquid fires.   Manufacturer Defendants designed, manufactured, marketed, and sold AFFF Products throughout the United States, including in Guam.  These AFFF Products contained PFOS, PFOA, and/or their precursors (*i.e.*, substances that break down in the environment into PFOS or PFOA).  When used, the AFFF Products released

PFOS and PFOA into the environment.  At all times relevant, Manufacturer Defendants controlled all, or substantially all, of the market in Guam for AFFF Products.

4.     PFOS and PFOA present a significant threat to Guam's environment and residents. They are mobile, persist indefinitely in the environment, bioaccumulate in individual organisms and humans, and biomagnify up the food chain.  PFOS and PFOA are also associated with multiple and significant adverse health effects in humans.   PFOS is associated with immune system suppression, including decreases in antibody responses to vaccines and increases in risk of childhood infections.  PFOA is associated with, among other things, kidney cancer, testicular cancer, high cholesterol, thyroid disease, ulcerative colitis, and pregnancy-induced hypertension.

5.     Since the creation of AFFF in the 1960s, Manufacturer Defendants have sold their AFFF Products to military and industrial facilities, airports, firefighting training academies, fire departments, and various commercial users in Guam and elsewhere.   These entities used Manufacturer Defendants' AFFF Products as they were intended to be used and in a foreseeable manner, which introduced PFOS and PFOA into the environment and contaminated natural resources.

6.     Manufacturer Defendants were aware of the toxic nature of PFOS and PFOA and the harmful and negative impact these substances have on the environment, wildlife, and human health.   Nevertheless, they continued to manufacture, market, and sell their AFFF Products in Guam and elsewhere, and they concealed the threat associated with use of their products.

7.     Guam's natural resources have been injured as a result of Defendants' conduct. Hagåtña, Ordot, and Guam International Airport  (which includes the former Naval Air Station Agana) have been identified as having AFFF Products-related contamination.  Due to elevated levels of PFOS in groundwater, the Guam Waterworks Authority ("GWA") was forced to place

two wells connected to the Hagåtña Groundwater Basin offline, which remain offline today. PFOS has also been found in at least four other wells near Guam International Airport; two of which also show elevated levels of PFOA.

8. As investigation continues, it is expected that further contamination from storage, handling, use, training with, testing equipment with, other discharges, and disposal of Manufacturer Defendants' AFFF Products will be uncovered in Guam, especially given the United States military's historical and current presence on the Island.

9. Accordingly, Guam brings this action to require Manufacturer Defendants to pay all costs necessary to fully investigate locations in Guam where their AFFF Products were stored, handled, used, trained with, tested equipment with, otherwise discharged, and disposed as well as all areas affected by their AFFF Products.

10. Guam also seeks to require Manufacturer Defendants to pay all costs necessary to remediate, assess, and restore the sites in Guam where there is AFFF Products-related contamination.

11. Guam also seeks from Manufacturer Defendants all damages that it is entitled to recover, including damages for injuries to all of Guam's natural resources, economic damages, restitution and disgorgement of Manufacturer Defendants' ill-gotten profits, punitive damages, and all other damages, fees, costs, and equitable relief to which it may be entitled.

12. In addition, Guam asserts fraudulent transfer claims in its capacity as creditor. Guam asserts claims under 20 GCA Sec. 6101 and 6103, and Del. Code Tit. 6 Sec. 1301 to 1312 based on a web of transactions that defendant E.I. du Pont de Nemours and Company ("Old DuPont") orchestrated and designed to shield significant assets from Guam and other creditors.

13.     Old DuPont has known for decades that it faces unprecedented environmental and personal injury liabilities for PFAS that it released into the environment in numerous parts of the country. For years, it has, at every step, sought to hinder Guam, and many other states and territories facing massive harm to the wellbeing of their citizens and their natural resources, from being able to recover on their eventual judgments.

14.     Old DuPont has sought to limit its PFAS liability by engaging in a series of complex restructuring transactions, including (i) the "spinoff" of its performance chemicals business (which included the manufacture of products which involved the use of PFOA and other PFAS) into defendant The Chemours Company ("Chemours"), (ii) a purported merger with The Dow Chemical Company ("Old Dow"), (iii) the transfer of Old DuPont's historic assets to other entities, including defendant DuPont de Nemours Inc. ("New DuPont"), and, (iv) ultimately, the spinoff of Old DuPont to a new parent company, defendant Corteva, Inc. These transactions were all designed to shield billions of dollars in assets from the PFAS liabilities that Old DuPont tried to isolate in Chemours.

15.     Old DuPont also sought to hide critical details of these transactions, in an attempt to keep Guam and other creditors in the dark, by burying them in non-public schedules to agreements. What is clear, however, is that Old DuPont shed more than $20 billion in tangible assets as a result of its restructuring efforts, in an attempt to put those assets outside of its creditors' reach. Accordingly, Guam is also asserting claims for actual and constructive fraudulent transfer in this action.

## THE PARTIES

16.     Guam is represented by and through the Attorney General of Guam.  Pursuant to 48 U.S.C. § 1421g(d)(1), the Attorney General is the chief legal officer of the Government of Guam. Guam is the trustee for the benefit of its citizens of all natural resources within its

jurisdiction. The Attorney General, on behalf of Guam, is authorized to protect this public trust and to seek compensation for injury to the natural resources of Guam. 5 GCA § 30103 (charging the Attorney General with, *inter alia*, bringing actions "on behalf of the Territory representing the citizens as a whole for redress of grievances which the citizens individually cannot achieve."). In addition, Guam may act in its *parens patriae* capacity to protect its "quasi-sovereign" interests, including its interest in the health and well-being of its residents and the integrity of its natural resources. Guam brings this case in its trustee and *parens patriae* capacities in order to address Island-wide contamination resulting from Manufacturer Defendants' AFFF Products.

17. Defendant The 3M Company ("3M") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 3M Center, St. Paul, Minnesota 55144-1000. On information and belief, 3M has designed, manufactured, marketed, and sold AFFF containing PFOS, PFOA, and/or their precursors that was stored, handled, used, trained with, tested equipment with, otherwise discharged, and/or disposed in Guam.

18. Defendant Tyco Fire Products LP ("Tyco") is a limited partnership organized under the laws of the State of Delaware, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143-2542. On information and belief, Tyco manufactures the Ansul brand of products and is the successor-in-interest to Ansul Company (collectively, "Tyco/Ansul"). On information and belief, Tyco/Ansul has designed, manufactured, marketed, and sold AFFF containing PFOA and/or its precursors that was stored, handled, used, trained with, tested equipment with, otherwise discharged, and/or disposed in Guam.

19. Defendant Chemguard, Inc. ("Chemguard") is a corporation organized under the laws of the State of Texas, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143-2542. On information and belief, Chemguard has designed,

manufactured, marketed, and sold AFFF containing PFOA and/or its precursors that was stored, handled, used, trained with, tested equipment with, otherwise discharged, and/or disposed in Guam. Further, on information and belief, Chemguard acquired Ciba-Specialty Chemical Corporation's ("Ciba") fluorosurfactants business in 2003, and Chemguard has designed, manufactured, marketed and sold fluorosurfactants containing PFOA and/or its precursors, and such AFFF Products were stored, handled, used, trained with, tested equipment with, otherwise discharged, and/or disposed in Guam.

20.     Defendant Buckeye Fire Equipment Company ("Buckeye") is a corporation organized under the laws of the State of Ohio, with its principal place of business located at 110 Kings Road, Kings Mountain, North Carolina 28086. On information and belief, Buckeye has designed, manufactured, marketed, and sold AFFF containing PFOA and/or its precursors that was stored, handled, used, trained with, tested equipment with, otherwise discharged, and/or disposed in Guam.

21.     Defendant Kidde-Fenwal, Inc. ("Kidde-Fenwal") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at One Financial Plaza, Hartford, Connecticut 06101. On information and belief, Kidde-Fenwal is the successor-in-interest to Kidde Fire Fighting, Inc. (f/k/a Chubb National Foam, Inc. f/k/a National Foam System, Inc.) (collectively, "Kidde/Kidde Fire"). On information and belief, Kidde/Kidde Fire has designed, manufactured, marketed, and sold AFFF containing PFOA and/or its precursors that was stored, handled, used, trained with, tested equipment with, otherwise discharged, and/or disposed in Guam.

22.     Defendant National Foam, Inc. ("National Foam") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 141 Junny Road,

Angier, North Carolina 27501. On information and belief, National Foam manufactures the Angus brand of products and is the successor-in-interest to Angus Fire Armour Corporation (collectively, "National Foam/Angus Fire"). On information and belief, National Foam/Angus Fire has designed, manufactured, marketed, and sold AFFF containing PFOA and/or its precursors that was stored, handled, used, trained with, tested equipment with, otherwise discharged, and/or disposed in Guam.

23. Defendant E.I. du Pont de Nemours and Company ("Old DuPont") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. On information and belief, Old DuPont designed, manufactured, marketed and sold fluorochemicals and/or fluorosurfactants containing PFOA, and/or its precursors used to manufacture AFFF, and such AFFF Products were stored, handled, used, trained with, tested equipment with, otherwise discharged, and/or disposed of in Guam.

24. Defendant The Chemours Company ("Chemours") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, P.O. Box 2047, Wilmington, Delaware, 19899. In 2015, Old DuPont spun off its performance chemicals business to Chemours, along with vast environmental liabilities which Chemours assumed, including those related to PFAS. Further, on information and belief, Chemours has designed, manufactured, marketed and sold fluorosurfactants containing PFOA and/or its precursors used to manufacture AFFF, and such AFFF Products were stored, handled, used, trained with, tested equipment with, otherwise discharged, and/or disposed in Guam.

25. Defendant Arkema, Inc. is a corporation organized under the laws of the State of Pennsylvania, with its principal place of business located at 900 First Avenue, King of Prussia, Pennsylvania 19406. On information and belief, Arkema is a successor in interest to Atochem

8

North America Inc., Elf Atochem North America, Inc., and Atofina Chemicals, Inc. On information and belief, Arkema and/or its predecessors have designed, manufactured, marketed and sold fluorosurfactants containing PFOA and/or its precursors used to manufacture AFFF, and such AFFF Products were stored, handled, used, trained with, tested equipment with, otherwise discharged, and/or disposed in Guam.

26. Defendant AGC Chemicals Americas, Inc. is a corporation organized under the laws of Delaware, with a principal place of business located at 5 East Uwchlan Avenue, Suite 201 Exton, Pennsylvania 19341. On information and belief, AGC Chemicals is the North American subsidiary of AGC Inc. (f/k/a Asahi Glass Co., Ltd.). On information and belief, AGC Chemicals and/or its affiliates have designed, manufactured, marketed and sold fluorochemicals containing PFOA and/or its precursors used to manufacture AFFF, and such AFFF Products were stored, handled, used, trained with, tested equipment with, otherwise discharged, and/or disposed in Guam.

27. Defendant Dynax Corporation ("Dynax") is a corporation organized under the laws of Delaware, with a principal place of business located at 79 Westchester Avenue, Pound Ridge, New York 10576. On information and belief, Dynax has designed, manufactured, marketed and sold fluorosurfactants containing PFOA and/or its precursors used to manufacture AFFF, and such AFFF Products were stored, handled, used, trained with, tested equipment with, otherwise discharged, and/or disposed in Guam.

28. Defendant Clariant Corporation ("Clariant") is a corporation organized under the laws of State of New York, with a principal place of business located at 4000 Monroe Road, Charlotte, North Carolina 28205. On information and belief, Clariant has designed, manufactured, marketed and sold fluorochemicals containing PFOA and/or its precursors used to manufacture

AFFF, and such AFFF Products were stored, handled, used, trained with, tested equipment with, otherwise discharged, and/or disposed in Guam.

29.     Manufacturer Defendants represent all or substantially all of the market for AFFF Products, including their key ingredients (fluorochemicals and fluorosurfactants), in Guam.

30.     Defendant DuPont de Nemours, Inc., formerly known as DowDuPont Inc. ("New DuPont") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805.  In 2015, after Old DuPont spun off Chemours, Old DuPont merged with The Dow Chemical Company ("Old Dow") and transferred Old DuPont's historic assets and liabilities to other entities, including New DuPont. In connection with these transfers, on information and belief, New DuPont assumed certain Old DuPont liabilities – including those relating to PFAS.

31.     Defendant Corteva, Inc. ("Corteva") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at P.O. Box 80735, Chestnut Run Plaza 735, Wilmington, Delaware 19805.  In 2019, New DuPont spun off a new, publicly-traded company, Corteva, which currently holds Old DuPont as a subsidiary.  In connection with these transfers, on information and belief, Corteva assumed certain Old DuPont liabilities – including those relating to PFAS.

**JURISDICTION AND VENUE**

32.     This action was initially filed in the Superior Court of Guam, Hagatna, Guam, with that Court having jurisdiction over the action pursuant to 7 GCA § 32201.  The Court further had jurisdiction over this action as provided by the Deceptive Trade Practices – Consumer Protection Act, because it is based in part on Manufacturer Defendants' acts, omissions, and false, misleading, and deceptive practices pursuant to 5 GCA § 32128(d).

33.     As initially filed, venue was proper because the claims arise in Guam.

34.     On November 4, 2019, 3M removed this action from the Superior Court of Guam to the United States District Court of Guam, purportedly on the basis of the federal officer removal statute, 28 U.S.C. § 1442(a)(1).  Thereafter, on January 2, 2020, this case was transferred from the United States District Court of Guam to the United States District Court of South Carolina for coordinated pretrial proceedings with *In re: Aqueous Film-Forming Foams Products Liability Litigation*, MDL No. 2873.  Plaintiff reserves all rights to seek an appropriate venue for the adjudication of its claims.

## FACTUAL ALLEGATIONS

35.     AFFF is a fire suppressing foam used to extinguish flammable liquid fires, including jet-fuel fires, aviation-related fires, hangar fires, ship fires, and chemical fires, and is used to train firefighters and test firefighting equipment.

36.     AFFF contains PFAS, which are highly fluorinated synthetic chemical compounds that include carbon chains containing at least one carbon atom on which all hydrogen atoms are replaced by fluorine atoms.  The PFAS family includes PFOS and PFOA.

37.     3M's AFFF, created using an electrochemical fluorination process, contain PFOS and PFOA.   The remaining Manufacturer Defendants' AFFF Products, created using a telomerization process, contain or break down into PFOA.  On information and belief, AFFF Products manufactured by Manufacturer Defendants other than 3M is a fungible product and lacks traits that would make it possible to identify the product as being manufactured, distributed, or sold by a particular Manufacturer Defendant.  Due to this fungibility, it may not be possible to identify the original manufacturer of the AFFF Products released at any particular site.  Any inability of Guam to identify the original manufacturer of the specific AFFF Products released into Guam's natural resources in particular instances at particular sites is a result of the fungibility of the products, and not as a result of any action or inaction by Guam.

38.     When used as intended during a firefighting event or training exercise, AFFF Products can result in the release of PFOS or PFOA to enter the environment in a variety of ways, including, but not limited to, through surface water and groundwater.

39.     Manufacturer Defendants advertised and sold AFFF Products to the United States government as well as to Guam and many other purchasers both for public and commercial use.

**PFOS and/or PFOA Released from Manufacturer Defendants' AFFF Products
Harm Guam's Environment and Wildlife**

40.     PFOS and PFOA have characteristics that have resulted in persistent contamination of Guam's natural resources.

41.     <u>PFOS and PFOA are Mobile</u>.  Once introduced into the environment, PFOS and PFOA quickly spread because they easily dissolve in water and, thus, reach numerous water systems.

42.     <u>PFOS and PFOA are Persistent</u>.  PFOS and PFOA persist in the environment indefinitely because their multiple fluorine-carbon bonds, which are exceptionally strong and stable, are resistant to metabolic and environmental degradation processes.

43.     <u>PFOS and PFOA Bioaccumulate and Biomagnify</u>.  Because PFOS and PFOA are very slowly excreted from individual organisms, ongoing low level exposure results in a build-up in body burden (*i.e.*, levels of PFOS and PFOA remaining within the body).  They also biomagnify, meaning their concentration in organic tissue increases as they are consumed up the food chain.

44.     <u>PFOS and PFOA are toxic</u>.  They cause adverse impacts to the environment and animal and human health.

**PFOS and/or PFOA Released from Manufacturer Defendants' AFFF Products Harm Guam's Residents**

45.     PFOS and PFOA are associated with a variety of adverse health effects in humans.

46.     PFOS exposure is associated with increases in serum lipids (*i.e.*, high cholesterol), decreases in antibody response to vaccines, increases in risk of childhood infections, and adverse reproductive and developmental effects, including pregnancy-induced hypertension and preeclampsia.

47.     PFOA exposure is associated with increases in serum lipids and certain liver enzymes (indicating liver damage), decreases in antibody response to vaccines, pregnancy-induced hypertension and preeclampsia, decreased birthweight, and testicular and kidney cancer.

48.     Fetuses and newborns are particularly sensitive to PFOS's and PFOA's toxicity. Further, exposures to newborns are higher (compared to other subpopulations) through breastmilk or prepared formula when drinking water is contaminated with PFOS and/or PFOA.

**Manufacturer Defendants' History of Manufacturing and Selling AFFF Products**

49.     3M began to produce PFOS and PFOA by electrochemical fluorination in the 1940s. In the 1960s, 3M used its fluorination process to develop AFFF.

50.     3M manufactured, marketed, and sold AFFF from the 1960s to the early 2000s. National Foam and Tyco/Ansul began to manufacture, market, and sell AFFF in the 1970s. Angus Fire and Chemguard began to manufacture, market, and sell AFFF in the 1990s. Buckeye began to manufacture, market, and sell AFFF in the 2000s.

51.     Arkema's predecessors supplied fluorosurfactants used to manufacture AFFF beginning in the 1970s. Ciba supplied fluorosurfactants used to manufacture AFFF beginning in the 1970s. Dynax supplied fluorosurfactants used to manufacture AFFF beginning in the 1990s. Old DuPont acquired Arkema's predecessors' fluorosurfactants business in 2002, after which it

supplied fluorosurfactants used to manufacture AFFF. Chemguard acquired Ciba's fluorosurfactants business in 2003, after which it supplied fluorosurfactants used to manufacture AFFF. Following Chemours's spin-off from Old DuPont, Chemours supplied fluorosurfactants used to manufacture AFFF.

52.     At varying times, AGC Chemicals, Clariant, and Old DuPont, supplied fluorochemicals used to make AFFF.

53.     From the 1960s through 2001, the United States Department of Defense purchased AFFF exclusively from 3M and Tyco/Ansul.

54.     In 2000, 3M announced it was phasing out its manufacture of PFOS, PFOA, and related products, including AFFF. 3M, in its press release announcing the phase out, stated "our products are safe," and that 3M's decision was "based on [its] principles of responsible environmental management." 3M further stated that "the presence of these materials at . . . very low levels does not pose a human health or environmental risk." In communications with the United States Environmental Protection Agency at that time, 3M also stated that it had "concluded that . . . other business opportunities were more deserving of the company's energies and attention . . . ."

55.     After 3M exited the AFFF market, the remaining Manufacturer Defendants continued to manufacture and sell AFFF Products that contained PFOA and/or its precursors. More recently, Manufacturer Defendants remaining in the AFFF Products market have shifted their production to short-chain "C6" products.

56.     Manufacturer Defendants knew their customers warehoused large stockpiles of AFFF Products. In fact, Manufacturer Defendants marketed their AFFF Products by touting its shelf-life. Even after Manufacturer Defendants fully understood the toxicity of PFOS and

PFOA—and their deleterious impacts when released directly into the environment through use and disposal of AFFF Products exactly as they had marketed it and intended that it be used— Manufacturer Defendants concealed the true nature of PFOS and PFOA. While Manufacturer Defendants phased out production or transitioned to other formulas, they did not properly inform their users about use of legacy AFFF Products that contained PFOS, PFOA, and/or their precursors. Manufacturer Defendants further did not act to get their harmful products off the market. Manufacturer Defendants did not warn public entities or others that, if they used AFFF Products with PFOS, PFOA, and/or their precursors, they would harm the environment, endanger human health, or incur substantial costs to investigate and clean up contamination of groundwater and other natural resources and to dispose of AFFF Products.

57. Accordingly, for many years after the original sale of AFFF Products that contained PFOS, PFOA, and/or their precursors, these AFFF Products were still being applied directly to the ground and washed into sediments, soils, and waters, harming the environment and endangering human health. Manufacturer Defendants never instructed their customers that they needed to properly dispose of their stockpiles of AFFF Products or how to properly dispose of AFFF Products.

**MANUFACTURER DEFENDANTS KNEW, OR AT THE VERY LEAST SHOULD HAVE KNOWN, THAT THEIR AFFF PRODUCTS CONTAINING PFOS, PFOA, AND/OR THEIR PRECURSORS WERE HARMFUL TO THE ENVIRONMENT AND HUMAN HEALTH**

**3M Knew for Decades that the PFOS and PFOA in its AFFF were Toxic and Sought to Suppress Negative Information Regarding these Chemicals**

58. 3M has known for decades that the PFAS, including PFOS and PFOA, contained in its AFFF are toxic and negatively impact the environment and human health.

59.     By 1956, 3M's PFAS were found to bind to proteins in human blood, resulting in bioaccumulation of those compounds in the human body.

60.     3M knew as early as 1960 that its PFAS waste could leach into groundwater and otherwise enter the environment.  An internal memo from 1960 described 3M's understanding that such wastes "[would] eventually reach the water table and pollute domestic wells."

61.     As early as 1963, 3M knew that its PFAS products were stable in the environment and did not degrade after disposal.

62.     By the 1970s, 3M had become concerned about exposure to fluorochemicals in the general population.

63.     By no later than 1970, 3M was aware that its PFAS products were hazardous to marine life.  One study of 3M's fluorochemicals around this time had to be abandoned to avoid severe pollution of nearby surface waters.

64.     In 1975, 3M found there was a "universal presence" of PFOA in blood serum samples taken from across the United States.  Since PFOA is not naturally occurring, this finding reasonably alerted 3M to the high likelihood that its products were a source of this PFOA-a possibility that 3M considered internally but did not share outside the company.  This finding also alerted 3M to the likelihood that PFOA is mobile, persistent, bioaccumulative, and biomagnifying, as those characteristics would explain the presence of PFOA in human blood.

65.     As early as 1976, 3M began monitoring the blood of its employees for PFAS because the company was concerned about PFAS's health effects.

66.     In 1978, 3M conducted PFOS and PFOA studies in monkeys and rats.  All monkeys died within the first few days or weeks after being given food contaminated with PFOS.  The studies also showed that PFOS and PFOA affected the liver and gastrointestinal tract of the species

tested.

67.     In the late 1970s, 3M studied the fate and transport characteristics of PFOS in the environment, including in surface water and biota.  A 1979 report drew a direct line between effluent from 3M's Decatur, Alabama plant and fluorochemicals bioaccumulating in fish tissue taken from the Tennessee River.

68.     According to a 3M environmental specialist who resigned his position due to the company's inaction over PFOS's environmental impacts, 3M had resisted calls from its own ecotoxicologists going back to 1979 to perform an ecological risk assessment on PFOS and similar chemicals.  At the time of the specialist's resignation in 1999, 3M continued its resistance.

69.     In 1983, 3M scientists opined that concerns about PFAS "give rise to legitimate questions about the persistence, accumulation potential, and ecotoxicity of fluorochemicals in the environment."

70.     Also in 1984, 3M's internal analyses demonstrated that fluorochemicals were likely bioaccumulating in 3M's employees.

71.     Despite its understanding of the hazards associated with the PFOS and PFOA in its products, 3M actively sought to suppress scientific research on the hazards associated with them, and it mounted a campaign to control the scientific dialogue on the fate, exposure, analytics, and effects to human health, and the ecological risks of PFOS and PFOA.

72.     At least one scientist funded by 3M saw his goal as "keep[ing] 'bad' papers [regarding PFAS] out of the literature" because "in litigation situations" those articles "can be a large obstacle to refute."

73.     3M engaged in a variety of tactics to deceive others and to hide the negative effects of PFAS.  For example, Dr. Rich Purdy, a former Environmental Specialist with 3M, wrote a letter

detailing:  (1) 3M's tactics to prevent research into the adverse effects of its PFOS; (2) 3M's submission of misinformation about its PFOS to the EPA; (3) 3M's failure to disclose substantial risks associated with its PFOS to the EPA; (4) 3M's failure to inform the public of the widespread dispersal of its PFOS in the environment and population; (5) 3M's production of chemicals it knew posed an ecological risk and a danger to the food chain; and (6) 3M's attempts to keep its workers from discussing the problems with the company's fluorochemical projects to prevent their discussions from being used in the legal process.

74.     Despite all of its knowledge, when 3M announced it would phase outs its PFOS, PFOA, and related products (including AFFF), it falsely asserted "our products are safe," instead of fully disclosing the substantial threat posed by PFOS and PFOA.

75.     3M knew, or at the very least should have known, that its AFFF , in its intended use, would release PFOS and/or PFOA in such a way that would significantly threaten the environment and public health.  Such knowledge was accessible to 3M, but not to Guam until 3M's acts and omissions came to light and Guam developed its own initial understanding of the toxicity of PFOS and PFOA.

### Remaining Manufacturer Defendants Knew, or at the Very Least Should have Known, that PFOA Released from their AFFF Products was Dangerous to the Environment and Human Health

76.     The remaining (non-3M) Manufacturer Defendants knew, or at the very least should have known, that in their intended and/or common use, their AFFF Products containing or breaking down into PFOA would harm the environment and human health.

77.     The remaining Manufacturer Defendants knew, or at the very least should have known that, their AFFF Products released PFOA that would dissolve in water, reach water systems

in Guam, resist degradation, bioaccumulate and biomagnify, and harm animal and human health due to their toxicity.

78.     Information regarding PFOA as well as other PFAS like PFOS was readily accessible to each of the remaining Manufacturer Defendants for decades (and, particularly, Old DuPont) because each is an expert in the field of AFFF Products manufacture and/or the PFAS-containing materials needed to manufacture AFFF Products, and each has detailed information and understanding about the PFAS in AFFF Products. Guam, by contrast, did not have access to such information, and, like many other public entities, is now only now beginning to understand the full consequences of the release of PFOS and/or PFOA into its natural resources.

### Old DuPont Knew for Decades that PFOA is Harmful to the Environment and Human Health, but Concealed its Knowledge from AFFF Products Users and Regulators

79.     Old DuPont scientists issued internal warnings about the toxicity associated with its PFOA products as early as 1961, including that PFOA caused adverse liver reactions in rats and dogs. Old DuPont's Toxicology Section Chief opined that such products should be "handled with extreme care," and that contact with the skin should be "strictly avoided."

80.     In 1978, based on information it received from 3M about elevated and persistent fluoride levels in workers exposed to PFOA, Old DuPont initiated a plan to review and monitor the health conditions of potentially-exposed workers in order to assess whether any negative health effects could be attributed to PFOA exposure. This monitoring plan involved obtaining blood samples from the workers and analyzing them for the presence of fluorine. As noted above, PFAS, including PFOS and PFOA, contain carbon and fluorine, and human exposure to these chemicals has been linked to elevated organic fluorine levels.

81.     By 1979, Old DuPont had data indicating that workers exposed to PFOA had a significantly higher incidence of health issues than unexposed workers.  Old DuPont did not report these data or the results of its worker health analyses to any government agency or community at that time.

82.     The following year, Old DuPont internally confirmed that PFOA "is toxic," that humans accumulate PFOA in their tissue, and that "continued exposure is not tolerable."

83.     Not only did Old DuPont know that PFOA accumulated in humans, but it was also aware that PFOA could cross the placenta from an exposed mother to her gestational child.  Old DuPont conducted a blood sampling study of pregnant or recently pregnant employees.  Of the eight women in the study who worked with fluoropolymers, two-or twenty-five percent-had children with birth defects in their eyes or face, and at least one had PFOA in the umbilical cord.

84.     Old DuPont reported to EPA, in March 1982, the results from a rat study showing PFOA crossing the placenta when present in maternal blood, but Old DuPont concealed the results of the study of its own plant workers.

85.     While Old DuPont knew about PFOA's toxicity danger as early as the 1960s, Old DuPont was also aware that PFAS was capable of contaminating the surrounding environment and causing human exposure.  No later than 1984, Old DuPont was aware that PFOA is biopersistent.

86.     Old DuPont held a meeting in 1984 to discuss the health and environmental issues related to PFOA. Old DuPont employees in attendance spoke of the PFOA issue as "one of corporate image, and corporate liability." They were resigned to Old DuPont's "incremental liability from this point on if we do nothing" because Old DuPont was "already liable for the past 32 years of operation."  They also stated that the "legal and medical [departments within Old

DuPont] will likely take the position of total elimination" of PFOA use in Old DuPont's business, and that these departments had "no incentive to take any other position."

87.     Old DuPont's own Epidemiology Review Board ("ERB") repeatedly raised concerns about Old DuPont's statements to the public that there were no adverse health effects associated with human exposure to PFOA.  For example, in February 2006, the ERB "strongly advise[d] against any public statements asserting that PFOA does not pose any risk to health" and questioned "the evidential basis of [Old DuPont's] public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health."

88.     Despite all of its knowledge regarding PFOA's toxicity, Old DuPont continued to claim that PFOA posed no health risks.  For example, in 2008, Old DuPont literature is quoted in an article on AFFF appearing in Industrial Fire World magazine, stating that Old DuPont "believes the weight of evidence indicates that PFOA exposure does not pose a health risk to the general public" because "there are no human health effects known to be caused by PFOA."

**Old DuPont Worked in Concert with other Manufacturer Defendants and the Firefighting Foam Coalition to Protect AFFF Products from Regulatory Scrutiny**

89.     The Firefighting Foam Coalition ("FFFC"), an AFFF trade group, was formed in 2001 to advocate for AFFF's continued viability.  National Foam, Kidde-Fenwal, Tyco/Ansul, Chemguard, Dynax, Old DuPont, and Chemours, among others in the industry, have been or are members of the FFFC ("FFFC Defendants").  Through their involvement in the FFFC, as well as a variety of other trade associations and groups, FFFC Defendants shared knowledge and information regarding PFOA and its precursors released from AFFF Products.

90.     The FFFC Defendants worked together to protect AFFF Products from scrutiny, including by coordinating their messaging on PFOA's toxicological profile and their AFFF Products' contribution of PFOA into the environment.  All of this was done to shield its members

and the AFFF industry from the detrimental impact of the public and regulators learning the truth about the harms of PFOA and their products to the environment and human health.

91. FFFC Defendants regularly published newsletters bolstering their AFFF Products. FFFC Defendants also regularly attended conferences. These coordinated efforts were meant to dispel concerns about the impact AFFF Products had on the environment and human health. They worked in concert to conceal known risks of their AFFF Products and the PFOA and its precursors contained therein from the government and public. On information and belief, they either had an express or tacit understanding to conceal such risks.

92. FFFC Defendants repeated the same message for years: Only one PFAS chemical, PFOS, had been taken off the market. Since the FFFC Defendants' AFFF Products did not contain PFOS, they claimed their products were safe.

93. Among other things, FFFC Defendants persuaded the EPA that their AFFF Products should be excluded from the EPA's enforceable consent agreement process related to PFOA and fluorinated telomer production by arguing that the products were not likely to be a source of PFOA in the environment.

94. FFFC Defendants knew, however, that their messaging regarding their AFFF Products was false. Each of the FFFC Defendants knew that PFOA was released from the use of their AFFF Products, and that PFOA presented a similar threat to the environment and public health as that posed by PFOS. While this was known to FFFC Defendants, it was not fully understood by the public and regulators, including Guam, until significant damage was already done.

## AFFF PRODUCTS HAVE RESULTED IN PFOS AND PFOA CONTAMINATION IN GUAM, INJURING NATURAL RESOURCES

95.     Guam's natural resources have been contaminated with PFOS and PFOA through the storage, handling, use, training with, testing equipment with, otherwise discharging, and/or disposal in Guam of AFFF Products, and investigation of the contamination is ongoing. Manufacturer Defendants' designing, manufacturing, marketing, and selling of AFFF Products throughout the United States, including in Guam, have been a substantial factor in causing injuries to the natural resources of Guam due to PFOS and PFOA contamination.  As investigation continues, additional sites are identified, and on- and off-site AFFF Products-related contamination is delineated, it is expected that significant contamination from use, handling, storage, training with, testing equipment with, otherwise discharging, and/or disposal of AFFF Products will be uncovered.

96.     Already, GWA has had to take action to combat AFFF Products-related contamination, through monitoring drinking water and protecting drinking water sources.  GWA has taken wells near Hagåtña offline because of PFOS contamination, and is faced with elevated levels of PFOS and PFOA near Guam International Airport.  PFOS and PFOA contamination related to AFFF poses a serious threat to Guam's groundwater supplies, which supply 80% of the drinking water to a population of 150,000 residents and nearly 1,000,000 visitors per year.

97.     Investigation is necessary to ascertain the scope of AFFF Products-related contamination and to return the natural resources impacted to levels that are safe for human health and the environment as well as to the condition they were in prior to the impact of these contaminants.  Manufacturer Defendants are liable for the cost of such investigation and restoration.

**OLD DUPONT'S MULTI-STEP FRAUDULENT SCHEME TO ISOLATE ITS
VALUABLE TANGIBLE ASSETS FROM ITS PFAS LIABILITIES
<u>AND HINDER CREDITORS</u>**

98.    By 2013, Old DuPont knew that it faced substantial environmental and other liabilities arising from PFOA and other PFAS contamination at chemical plants that it owned and operated throughout the country, and that its liability was likely billions of dollars.

99.    These liabilities include remediation obligations, tort damages, natural resource damages, and, most importantly, likely massive and potentially crippling punitive damages arising from Old DuPont's intentional misconduct.

100.    In light of this significant exposure, on information and belief, by 2013, Old DuPont's management began to consider restructuring the company in order to, among other things, avoid responsibility for the widespread environmental harm that Old DuPont's PFAS had caused, and shield billions of dollars in assets from these substantial liabilities.  Old DuPont referred to this initiative internally as "Project Beta."

101.    On information and belief, Old DuPont contemplated various restructuring opportunities, including potential merger structures.  In or about 2013, Old DuPont and Old Dow began discussions about a possible "merger of equals."

102.    On information and belief, Old DuPont recognized that neither Old Dow, nor any other rational merger partner, would agree to a transaction that would result in exposing Old Dow, or any other merger partner, to the substantial PFAS liabilities that Old DuPont faced.

103.    Accordingly, Old DuPont's management decided to pursue a corporate restructuring strategy specifically designed to isolate Old DuPont's massive legacy liabilities from its valuable tangible assets in order to shield those assets from creditors, and entice Old Dow to pursue the proposed merger.

104. Old DuPont engaged in a three-part restructuring plan, further explained below.

105. The first step in Old DuPont's plan was to transfer its performance chemicals business (which included the manufacture of products that involved the use of PFOA and other PFAS) ("Performance Chemicals Business") into its wholly-owned subsidiary, Chemours. And then, in July 2015, Old DuPont "spun-off" Chemours as a separate public entity and saddled Chemours with Old DuPont's massive legacy liabilities (the "Chemours Spinoff").

106. Old DuPont knew that Chemours was undercapitalized and could not satisfy the massive liabilities that it caused Chemours to assume. Old DuPont also knew that the Chemours Spinoff alone would not isolate its own assets from its PFAS liabilities, and that Old DuPont still faced direct liability for its own conduct.

107. Accordingly, Old DuPont moved on to the next step of its plan, designed to further distance itself from the exposure it had created over its decades-long bad conduct with regard to PFAS.

108. The second step involved Old DuPont and Old Dow entering into an "Agreement and Plan of Merger" in December 2015, pursuant to which Old DuPont and Old Dow merged with subsidiaries of a newly-formed holding company, DowDuPont, Inc. ("DowDuPont"), which was created for the sole purpose of effectuating the merger. Old DuPont and Old Dow became subsidiaries of DowDuPont.

109. Then, through a series of subsequent agreements, DowDuPont engaged in numerous business segment and product line "realignments" and "divestitures."

110. The net effect of these transactions was to transfer, either directly or indirectly, a substantial portion of Old DuPont's assets to DowDuPont.

111.     The third step involved DowDuPont spinning off two, new, publicly-traded companies: (i) Corteva, which currently holds Old DuPont as a subsidiary, and (ii) Dow, Inc. ("New Dow") which currently holds Old Dow. DowDuPont was then renamed DuPont de Nemours, Inc. ("New DuPont").

112.     As a result of these transactions, between December 2014 (pre-Chemours Spinoff) and December 2019 (post-Dow merger), the value of Old DuPont's tangible assets decreased by $20.85 billion.

113.     New DuPont and New Dow now hold the vast majority of the tangible assets that Old DuPont formerly owned.

114.     Many of the details about these transactions are hidden from the public in confidential schedules and exhibits to the various restructuring agreements. On information and belief, Old DuPont, New DuPont, New Dow, and Corteva have intentionally buried these details in an attempt to hide from creditors, like Guam, where Old DuPont's valuable assets went and the inadequate consideration that Old DuPont received in return.

### Step 1: The Chemours Spinoff

115.     In February 2014, Old DuPont formed Chemours as a wholly-owned subsidiary. Chemours was originally incorporated on February 18, 2014 under the name "Performance Operations, LLC."

116.     On or about April 15, 2014, the company was renamed "The Chemours Company, LLC," and on April 30, 2015, it was converted from a limited liability company to a corporation named "The Chemours Company."

117.     Prior to July 1, 2015, Chemours was a wholly-owned subsidiary of Old DuPont.

118.     On July 1, 2015, Old DuPont completed the spinoff of its Performance Chemicals Business, and Chemours became a separate, publicly traded entity, *i.e.*, the "Chemours Spinoff."

119.     At the time of the Chemours Spinoff, the Performance Chemicals Business consisted of Old DuPont's Titanium Technologies, Chemical Solutions and Fluorochemicals segments.

120.     The Performance Chemicals Business included the fluoroproducts and chemical solutions businesses that had manufactured, used, and discharged PFAS into the environment.

121.     Prior to the Chemours Spinoff, Chemours was a wholly-owned subsidiary of Old DuPont, and its Board of Directors had three members, all of whom were Old DuPont employees.

122.     On June 19, 2015, a fourth member of the Board was appointed, and on information and belief, this fourth member had served as a member of Old DuPont's Board of Directors from 1998 to 2015.

123.     On July 1, 2015, effective immediately prior to the Chemours Spinoff, the size of the Chemours Board of Directors was expanded to eight members. The three initial Old DuPont employees resigned from the Board, and to fill the vacancies created thereby, seven new members were appointed.

124.     To effectuate the Chemours Spinoff, Old DuPont and Chemours entered into the June 26, 2015 Separation Agreement (the "Chemours Separation Agreement").

125.     Pursuant to the Chemours Separation Agreement, Old DuPont agreed to transfer to Chemours all businesses and assets related to the Performance Chemicals Business, including 37 active chemical plants.

126.     Old DuPont completed a significant internal reorganization prior to the Chemours Spinoff, such that all of the assets that Old DuPont deemed to be part of the Performance Chemicals Business would be transferred to Chemours.

127.     At the same time, Chemours accepted a broad assumption of liabilities for Old DuPont's historical use, manufacture, and discharge of PFAS, although the specific details regarding the nature, probable maximum loss value, and anticipated timing of the liabilities that Chemours assumed are set forth in the non-public schedules and exhibits to the Chemours Separation Agreement.

128.     Notwithstanding the billions of dollars in PFAS liabilities that Chemours would face, on July 1, 2015, Chemours transferred to Old DuPont approximately $3.4 billion as a cash dividend, along with a "distribution in kind" of promissory notes with an aggregate principal amount of $507 million.

129.     Thus, in total, Chemours distributed $3.9 billion to Old DuPont. Chemours funded these distributions by entering into approximately $3.995 billion of financing transactions, including senior secured term loans and senior unsecured notes, on May 12, 2015. Also, Chemours distributed approximately $3.0 billion in common stock to Old DuPont shareholders on July 1, 2015 (181 million shares at $16.51 per share price).

130.     Accordingly, most of the valuable assets that Chemours may have had at the time of the Chemours Spinoff were unavailable to creditors with current or future PFAS claims, and Old DuPont stripped Chemours's value for itself and its shareholders. In total, Chemours transferred almost $7 billion in stock, cash and notes to Old DuPont and its shareholders. Old DuPont, however, only transferred $4.1 billion in net assets to Chemours. And, Chemours assumed billions of dollars of Old DuPont's PFAS and other liabilities.

131. In addition to the assumption of such liabilities, the Chemours Separation Agreement required Chemours to provide broad indemnification to Old DuPont in connection with these liabilities, which is uncapped and does not have a survival period.

132. The Chemours Separation Agreement requires Chemours to indemnify Old DuPont against, and to assume for itself; all "Chemours Liabilities," which is defined broadly to include, among other things, "any and all Liabilities relating . . . primarily to, arising primarily out of or resulting primarily from, the operation or conduct of the Chemours Business, as conducted at any time prior to, at or after the Effective Date . . . including . . . any and all Chemours Assumed Environmental Liabilities . . . ," which includes Old DuPont's historic liabilities relating to and arising from its decades of emitting PFOA into the environment from its facilities.

133. The Chemours Separation Agreement also requires Chemours to indemnify Old DuPont against, and assume for itself, the Chemours Liabilities regardless of: (i) when or where such liabilities arose; (ii) whether the facts upon which they are based occurred prior to, on, or subsequent to the effective date of the spinoff; (iii) where or against whom such liabilities are asserted or determined; (iv) whether arising from or alleged to arise from negligence, gross negligence, recklessness, violation of law, fraud or misrepresentation by any member of the Old DuPont group or the Chemours group; (v) the accuracy of the maximum probable loss values assigned to such liabilities; and (vi) which entity is named in any action associated with any liability.

134. The Chemours Separation Agreement also requires Chemours to indemnify Old DuPont from, and assume all, environmental liabilities that arose prior to the spinoff if they were "primarily associated" with the Performance Chemicals Business.

135.    Such liabilities were deemed "primarily associated" if Old DuPont reasonably determined that 50.1% of the liabilities were attributable to the Performance Chemicals Business.

136.    Among the environmental liabilities assumed by Chemours was litigation over benzene, a carcinogen released from some of Old DuPont's plants.

137.    In December 2015, a Texas jury awarded $8.4 million to a painter who developed leukemia after using paints with benzene for years, with at least 27 more benzene cases pending as of September 30, 2016.

138.    Chemours is also obligated to clean-up Pompton Lakes, New Jersey, where Old DuPont manufactured explosives from 1902 to 1994, and where lead salts, mercury, volatile organic compounds, explosive powders, chlorinated solvents, and detonated blasting caps still contaminate groundwater and soil. Chemours' filings with the U.S. Securities and Exchange Commission ("SEC") estimate that the remediation, which began in 1985, may cost as much as $119 million to complete.

139.    Chemours also agreed to use its best efforts to be fully substituted for Old DuPont with respect to "any order, decree, judgment, agreement or Action with respect to Chemours Assumed Environmental Liabilities . . . ."

140.    In addition to the assumption of such liabilities, Chemours also provided broad indemnification to Old DuPont in connection with these liabilities, which is uncapped and does not have a survival period.

141.    The effect of the creation of Chemours was to segregate a large portion of Old DuPont's environmental liabilities, including liabilities related to its PFAS chemicals and products.

142.    The consolidation of Old DuPont's performance chemical liabilities has potentially limited the availability of funds arising out of Old DuPont's liability.

143.    As Chemours explained in its November 2016 SEC filing: "[s]ignificant unfavorable outcomes in a number of cases in the [Ohio] MDL could have a material adverse effect on Chemours consolidated financial position, results of operations or liquidity."

144.    On February 13, 2017, Old DuPont and Chemours agreed to pay $670.7 million to resolve the approximately 3,500 then-pending cases in the Ohio MDL.

145.    Chemours also agreed to pay $25 million for future PFOA costs not covered by the settlement for each of the next five years (up to an additional $125 million).

146.    Old DuPont also agreed to cover additional amounts up to $25 million for five years.

147.    At the time of the transfer of its Performance Chemicals Business to Chemours, Old DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding Old DuPont's liability for damages and injuries from the manufacture of PFAS compounds and products that contain PFAS compounds.

148.    Notably, Chemours sued Old DuPont in Delaware state court in 2019, alleging, among other things, that if (i) the full value of Old DuPont's PFAS liabilities were properly estimated, and (ii) the Court does not limit Chemours' liability that the Chemours Separation Agreement imposes, then Chemours would have been insolvent at the time of the Chemours Spinoff.

149.    There was no meaningful, arms-length negotiation of the Chemours Separation Agreement.

150.     In its Delaware lawsuit, Chemours alleges that Old DuPont refused to allow any procedural protections for Chemours in the negotiations, and Old DuPont and its outside counsel prepared all the documents to effectuate the Chemours Spinoff. Indeed, during the period in which the terms of commercial agreements between Chemours and Old DuPont were negotiated, Chemours did not have an independent board of directors or management independent of Old DuPont.

151.     Although Chemours had a separate board of directors, Old DuPont employees controlled the Chemours board. Indeed, when the Chemours Separation Agreement was signed, Chemours was a wholly-owned subsidiary of Old DuPont, and the Chemours board consisted of three Old DuPont employees and one former, long-standing member of the Old DuPont board.

152.     Chemours' independent board of directors, newly appointed on July 1, 2015, immediately prior to the Chemours Spinoff, did not participate in the negotiations of the terms of the separation.

153.     It is apparent that Old DuPont's goal with respect to the Chemours Spinoff was to segregate a large portion of Old DuPont's legacy environmental liabilities, including liabilities related to its PFAS chemicals and products, and in so doing, shield Old DuPont's assets from any financial exposure associated therewith.

154.     Not surprisingly, given Old DuPont's extraction of nearly $4 billion from Chemours immediately prior to the Chemours Spinoff, Chemours was thinly capitalized and unable to satisfy the substantial liabilities that it assumed from Old DuPont. Indeed, Chemours disclosed in public SEC filings that its "significant indebtedness" arising from its separation from Old DuPont restricted its current and future operations.

155.    Shortly after the Chemours Spinoff, market analysts described Chemours as "a bankruptcy waiting to happen" and a company "purposely designed for bankruptcy."

156.    At the end of December 2014, Chemours reported it had total assets of $5.959 billion and total liabilities of $2.286 billion. At the end of 2015, following the Chemours Spinoff, Chemours reported that it had total assets of $6.298 billion and total liabilities of $6.168 billion as of December 31, 2015, yielding total net worth of $130 million.

157.    Removing Chemours' goodwill and other intangibles of $176 million yields a tangible net worth of negative $46 million (that is, Chemours' liabilities were greater than its tangible assets). According to unaudited *pro forma* financial statements, as of March 31, 2015 (but giving effect to all of the transactions contemplated in the Chemours Spinoff), Chemours had total assets of $6.4 billion and total liabilities of $6.3 billion

158.    Chemours also reported that these liabilities included $454 million in "other accrued liabilities," which in turn included $11 million for accrued litigation and $68 million for environmental remediation. Chemours also had $553 million in "other liabilities," which included $223 million for environmental remediation and $58 million for accrued litigation.

159.    Chemours significantly underestimated its liabilities, including the liabilities that it had assumed from Old DuPont with respect to PFAS, and which Old DuPont and Chemours knew or should have known would be tens of billions of dollars.

160.    Had Chemours taken the full extent of Old DuPont's legacy liabilities into account, as it should have done, it would have had negative equity (that is, total liabilities that are greater than total assets), not only on a tangible basis, but also on a total equity basis, and, Chemours would have been rendered insolvent at the time of the Chemours Spinoff.

## Step 2: The Old Dow/Old DuPont "Merger"

161.    After the Chemours Spinoff, Old DuPont took the untenable position that it was somehow no longer responsible for the widespread PFAS contamination that it had caused over several decades. Old DuPont publicly claimed that the PFAS liabilities associated with the Performance Chemicals Business that Old DuPont had transferred to Chemours rested solely with Chemours, and not with Old DuPont.

162.    Of course, Old DuPont could not contractually discharge all of its historical liabilities through the Chemours Spinoff, and Old DuPont remained liable for the liabilities it had caused, and that Chemours had assumed.

163.    Old DuPont knew that it could not escape liability and would still face exposure for PFAS liabilities, including for potentially massive punitive damages. So Old DuPont moved to the next phase of its fraudulent scheme.

164.    On December 11, 2015, less than six months following the Chemours Spinoff, Old DuPont and Old Dow announced that their respective boards had approved an agreement "under which the companies [would] combine in an all-stock merger of equals" and that the combined company would be named DowDuPont, Inc. ("Dow-DuPont Merger"). The companies disclosed that they intended to subsequently separate the combined companies' businesses into three publicly-traded companies through further spinoffs, each of which would occur 18 to 24 months following the closing of the merger.

165.    To effectuate the transaction, Old DuPont and Old Dow entered into an Agreement and Plan of Merger (the "Dow-DuPont Merger Agreement") that provided for: (i) the formation of a new holding company – Diamond-Orion HoldCo, Inc., later named DowDuPont, and then

renamed DuPont de Nemours, Inc., *i.e.*, "New DuPont," and (ii) the creation of two new merger subsidiaries into which Old Dow and Old DuPont each would merge.

166.    Upon the closing of the DowDuPont Merger, Old Dow merged into one merger subsidiary, and Old DuPont merged into the other merger subsidiary. Thus, as a result of the merger, and in accordance with the DowDuPont Merger Agreement, Old Dow and Old DuPont each became wholly-owned subsidiaries of DowDuPont.

167.    Although Old DuPont and Old Dow referred to the transaction as a "merger of equals," the two companies did not actually merge at all, because doing so would have infected Old Dow with all of Old DuPont's historical PFAS liabilities. Rather, Old DuPont and Old Dow became affiliated sister companies that were each owned by the newly formed DowDuPont (*i.e.*, New DuPont).

168.    The below image reflects the corporate organization following the "merger":



**Step 3: The Shuffling, Reorganization, and Transfer of Valuable
Assets Away from Old DuPont and Separation of Corteva and New Dow**

169.    Following the Dow-DuPont Merger, DowDuPont underwent a significant internal reorganization, and engaged in numerous business segment and product line "realignments" and "divestitures." The net effect of these transactions has been the transfer, either directly or indirectly, of a substantial portion of Old DuPont's assets out of the company.

170.    While, again, the details of these transactions remain hidden from Guam and other creditors, it is apparent that the transactions were intended to frustrate and hinder creditors with claims against Old DuPont, including with respect to its substantial PFAS liabilities. The significant internal reorganization instituted by DowDuPont was in preparation for the conglomerate being split into three separate, publicly-traded companies.

171.    Old DuPont's assets, including its remaining business segments and product lines, were transferred either directly or indirectly to DowDuPont, which reshuffled the assets and combined them with the assets of Old Dow, and then reorganized the combined assets into three distinct divisions: (i) the "Agriculture Business," (ii) the "Specialty Products Business," and (iii) the "Material Sciences Business."

172.    While the precise composition of these divisions, including many details of the specific transactions, the transfer of business segments, and the divestiture of product lines during this time, are not publicly available, it is apparent that Old DuPont transferred a substantial portion of its valuable assets to DowDuPont, for far less than the assets were worth.

173.    Once the assets of Old DuPont and Old Dow were combined and reorganized, DowDuPont incorporated two new companies to hold two of the three newly formed business lines: (i) Corteva, which became the parent holding company of Old DuPont, which in turn holds the Agriculture Business, and (ii) New Dow, which became the parent holding company of Old

Dow, and which holds the Materials Science Business. DowDuPont retained the Specialty Products Business, and prepared to spin off Corteva and New Dow into separate, publicly traded companies.

174. The below graph depicts the structure of DowDuPont after the internal reorganization and realignment:



175. The mechanics of the separations are governed by the April 1, 2019 Separation and Distribution Agreement among Corteva, New Dow and DowDuPont (the "DowDuPont Separation Agreement").

176. The agreement generally allocates the assets primarily related to the respective business divisions to Corteva (Agriculture Business), New Dow (Materials Science Business) and New DuPont (Specialty Products Business), respectively. New DuPont also retained several "non-core" business segments and product lines that once belonged to Old DuPont.

177. Similarly, Corteva, New Dow and New DuPont each retained the liabilities primarily related to the business divisions that they retained, *i.e.*, (i) Corteva retained and assumed the liabilities related to the Agriculture Business, (ii) New DuPont retained and assumed the liabilities related to the Specialty Products Business, and (iii) New Dow retained and assumed the liabilities related to the Materials Science Business.

178. Corteva and New DuPont also assumed direct financial liability of Old DuPont that was not related to the Agriculture, Material Science or Specialty Products Businesses, including, on information and belief, the PFAS liabilities. These assumed PFAS liabilities are allocated on a *pro rata* basis between Corteva and New DuPont pursuant to the DowDuPont Separation Agreement, such that, after both companies have satisfied certain conditions, future liabilities are allocated 71% to New DuPont and 29% to Corteva.

179. This "allocation" applies to Old DuPont's legacy liabilities for PFAS contamination and its former Performance Chemicals Business, including Guam's claims in this case.

180. While New DuPont and Corteva have buried the details in non-public schedules, on information and belief, New DuPont and Corteva each assumed these liabilities under the DowDuPont Separation Agreement, along with other liabilities related to Old DuPont's discontinued and divested businesses. Guam can therefore bring claims against New DuPont and Corteva directly for Old DuPont's contamination of Guam's natural resources.

181. The separation of New Dow was completed on or about April 1, 2019, when DowDuPont distributed all of New Dow's common stock to DowDuPont stockholders as a *pro rata* dividend. New Dow now trades on the New York Stock Exchange ("NYSE") under Old Dow's stock ticker "DOW."

182.     On or about May 2, 2019, DowDuPont consolidated the Agricultural Business line into Old DuPont, and then, on or about May 31, 2019, it "contributed" Old DuPont to Corteva. The following day, on June 1, 2019, DowDuPont spun off Corteva as an independent public company.

183.     Corteva now holds 100% of the outstanding common stock of Old DuPont. Corteva now trades on the NYSE under the stock ticker "CTVA."

184.     The separation of Corteva was completed on or about June 1, 2019, when DowDuPont distributed all of Corteva's common stock to DowDuPont stockholders as a *pro rata* dividend.

185.     The corporate structures of New Dow and Old Dow, and Corteva and Old DuPont, respectively, following the separations are depicted below:



186.    Also, on or about June 1, 2019, DowDuPont changed its registered name to Du Pont de Nemours Inc. ("New DuPont").

**The Effect of the Years-Long Scheme To
Defraud Guam and Other Creditors and Avoid
Financial Responsibility for Legacy Liabilities**

187.    The net results of these transactions was to strip away valuable tangible assets from Old DuPont, and transfer those assets to New DuPont and Corteva for far less than the assets are worth.

188.    Old DuPont estimated that the Dow-DuPont Merger created "goodwill" worth billions of dollars. When the Corteva separation was complete, a portion of this "goodwill" was assigned to Old DuPont in order to prop up its balance sheet. But, in reality, Old DuPont was left with substantially fewer tangible assets than it had prior to the restructuring.

189.    In addition, Old DuPont owes a debt to Corteva of approximately $4 billion. Recent SEC filings demonstrate the substantial deterioration of Old DuPont's finances and the drastic change in its financial condition before and after the above transactions.

190.    For example, for the fiscal year ended 2014, prior to the Chemours Spinoff, Old DuPont reported $3.6 billion in net income and $3.7 billion in cash provided by operating activities. For the fiscal year ended 2019, just months after the Corteva separation, however, Old DuPont reported a net loss of negative $1 billion and only $996 million in cash provided by operating activities. That is a decrease of 128% in net income and a decrease of 73% in annual operating cash flow.

191.    Additionally, Old DuPont reported a significant decrease in Income From Continuing Operations Before Income Taxes ("EBT"). Old DuPont reported $4.9 billion in EBT for the period ending December 31, 2014. For the period ending December 31, 2019, Old DuPont reported EBT of negative $422 million.

192. The value of Old DuPont's tangible assets further underscores Old DuPont's precarious financial situation. For the fiscal year ended 2014, prior to the Chemours Spinoff, Old DuPont owned nearly $41 billion in tangible assets. For the fiscal year ended 2019, Old DuPont owned just under $21 billion in tangible assets.

193. That means in the five-year period over which the restructuring occurred, when Old DuPont knew that it faced billions of dollars in PFAS liabilities, Old DuPont transferred or divested approximately half of its tangible assets—totaling $20 billion.

194. As of September 2019, just after the Corteva spinoff, Old DuPont reported $43.251 billion in assets. But almost $21.835 billion of these assets were comprised of intangible assets, including "goodwill" from its successive restructuring activities.

195. At the same time, Old DuPont reported liabilities totaling $22.060 billion. Thus, when the Corteva spinoff was complete, Old DuPont's tangible net worth (excluding its intangible assets) was negative $644 million.

196. Old DuPont's financial condition has continued to deteriorate. By fiscal year ended 2019, Old DuPont reported $42.397 billion in total assets, half of which (or $21.653 billion) are intangible assets. Old DuPont's reported liabilities for the same period totaled $21.869 billion.

197. Old DuPont's tangible net worth between September 30, 2019 and December 31, 2019 declined even further, whereby Old DuPont ended fiscal year 2019 with tangible net worth of negative $1.125 billion.

198. In addition, Guam cannot take comfort in the "allocation" of liabilities to New DuPont and Corteva. Neither of those Defendants has publicly conceded that they assumed Old DuPont's historical PFAS liabilities. And it is far from clear that either entity will be able to satisfy any judgment in this case.

199. Indeed, New DuPont—to which 71% of PFAS liabilities are "allocated" under the DowDuPont Separation Agreement once certain conditions are satisfied—is in the process of divesting numerous business segments and product lines, including tangible assets that it received from Old DuPont, and for which Old DuPont has received less than reasonably equivalent value.

200. New DuPont has received or will receive significant proceeds on the sales of Old DuPont's former business segments and product lines.

201. In September 2019, New DuPont sold the Sustainable Solutions business for $28 million to Gyrus Capital.

202. On or about December 15, 2019, New DuPont agreed to sell the Nutrition and Biosciences business to International Flavors & Fragrances for $26.2 billion.

203. In March 2020, New DuPont completed the sale of Compound Semiconductor Solutions for $450 million to SK Siltron.

204. In addition, New DuPont has issued Notices of Intent to Sell relating to: six non-core segments (estimated by market analysts at approximately $4.5 billion), as well as the Transportation and Industrial Chemicals business, which had reported net sales revenue in 2019 of $4.95 billion and estimated annual operating earnings before interest, taxes, depreciation, and amortization of $1.3 billion.

205. Old DuPont's parent holding company, Corteva—to which 29% of PFAS liabilities are "allocated" under the DowDuPont Separation Agreement once certain conditions are satisfied—holds as its primary tangible asset the intercompany debt owed to it by its wholly-owned subsidiary, Old DuPont. But Old DuPont does not have sufficient tangible assets to satisfy this debt obligation.

## **FIRST COUNT**
### **Strict Products Liability—Design Defect**

206.     Guam incorporates by reference all allegations contained in the previous paragraphs.

207.     Manufacturer Defendants designed, manufactured, marketed, and sold AFFF Products containing PFOS, PFOA, and/or their precursors that were stored, handled, used, trained with, tested equipment with, otherwise discharged, and disposed of in Guam during the relevant period.

208.     As designers, manufacturers, marketers, and sellers of AFFF Products, Manufacturer Defendants had a duty to make and sell products that are reasonably fit, suitable, and safe for their intended or reasonably foreseeable uses.  Manufacturer Defendants owed that duty both to reasonably foreseeable users of their products and also to any person or property that might reasonably be expected to come into contact with those products.

209.     Manufacturer Defendants' AFFF Products containing PFOS, PFOA, and/or their precursors were used in a reasonably foreseeable manner and without substantial change in the condition of such products.  These products were defective and unfit for their reasonable use.  Manufacturer Defendants' AFFF Products foreseeably contaminated groundwater and other natural resources at and around the sites where they were used.  Manufacturer Defendants knew or reasonably should have known that their manufacture, marketing, and/or sale, as well as their customers' storage, handling, use, training with, testing equipment with, other discharge, and disposal of AFFF Products in an intended or reasonably foreseeable manner, would result in the release of PFOS and PFOA in the environment, including in Guam.

210.     AFFF Products containing PFOS, PFOA, and/or their precursors in Guam have injured and are continuing to injure groundwater and other natural resources.  Manufacturer

Defendants' AFFF Products were defective in design and unreasonably dangerous because, among other things:

1) Manufacturer Defendants' AFFF Products cause persistent PFOS and PFOA contamination when used in a reasonably foreseeable and intended manner;

2) PFOS and PFOA released into the environment from Manufacturer Defendants' AFFF Products cause contamination in groundwater and surface water that are the sources of drinking water and pose significant threats to public health and welfare; and

3) Manufacturer Defendants failed to disclose reasonable, appropriate, and/or adequate scientific studies to evaluate the environmental fate and transport and potential ecological and human health effects of PFOS and PFOA.

211.    At all times relevant to this action, the AFFF Products that Manufacturer Defendants designed, manufactured, marketed, and sold were dangerous to an extent beyond that which would be contemplated by the ordinary consumer.

212.    At all times relevant to this action, the foreseeable risk to the environment and public health and welfare posed by Manufacturer Defendants' AFFF Products containing PFOS, PFOA, and/or their precursors outweighed the cost to Manufacturer Defendants of reducing or eliminating such risk.

213.    At all times relevant to this action, Manufacturer Defendants knew or should have known about reasonably safer and feasible alternatives to their AFFF Products, and the omission of such alternative designs rendered their AFFF Products not reasonably safe. While Manufacturer Defendants have recently transitioned to short-chain PFAS-based AFFF Products, which they

claim are safer, they could have made this transition earlier. Moreover, AFFF Products can be designed with fluorine-free compounds, which do not contain or break down into PFAS.

214. As a direct and proximate result of the defects in Manufacturer Defendants' design, manufacture, marketing, and sale of AFFF Products containing PFOS, PFOA, and/or their precursors, groundwater and other natural resources in Guam have become contaminated with PFOS and/or PFOA, causing Guam and its citizens significant injury and damage.

215. As a direct and proximate result of Manufacturer Defendants' acts and omissions, as alleged herein, Guam is incurring, and will continue to incur, damages in an amount to be proved at trial related to PFOS and PFOA contamination of groundwater and other natural resources resulting from Manufacturer Defendants' AFFF Products.

216. As a further direct and proximate result of Manufacturer Defendants' acts and omissions alleged in this First Amended Complaint, Guam has incurred, and will continue to incur, investigation, cleanup and removal, restoration, treatment, monitoring, and other costs and expenses related to contamination of the groundwater and other natural resources resulting from Manufacturer Defendants' AFFF Products, for which Manufacturer Defendants are strictly, jointly, and severally liable.

217. Manufacturer Defendants knew it was substantially certain that their acts and omissions described above would cause the contamination and harms described herein.

218. As long as Guam's natural resources remain contaminated with PFOS and/or PFOA due to Manufacturer Defendants' conduct, these harms continue.

219. Manufacturer Defendants are strictly liable for all such damages, and Guam is entitled to recover all such damages and other relief as set forth below.

220.    On information and belief, Corteva and New DuPont assumed Old DuPont's design defect liability described above.

## SECOND COUNT
### Strict Products Liability—Failure to Warn

221.    Guam incorporates by reference all allegations contained in the previous paragraphs.

222.    As designers, manufacturers, marketers, and sellers of AFFF Products containing PFOS, PFOA, and/or their precursors, Manufacturer Defendants had a strict duty to Guam and to those who were at risk of being harmed by AFFF Products to warn users of those products and Guam of the foreseeable harms associated with them.

223.    Manufacturer Defendants had a duty to warn Guam about the dangers of their AFFF Products because, among other things, Guam is the trustee, for the benefit of its citizens, of all natural resources within its jurisdiction and because Guam maintains a "quasi-sovereign" interest in the well-being of its residents.

224.    Manufacturer Defendants inadequately warned of the likelihood that PFOS and/or PFOA would be released into the environment during the normal use of their AFFF Products, and of the widespread, toxic, and persistent effects of such releases.  Manufacturer Defendants failed to provide such warnings to (i) users and buyers of their AFFF Products containing PFOS, PFOA, and/or their precursors, (ii) Guam, and (iii) others to which it was reasonably foreseeable Manufacturer Defendants' AFFF Products would cause harm.  To the extent Manufacturer Defendants provided any warnings about their products, they were not warnings that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger posed by AFFF Products containing PFOS, PFOA, and/or their precursors, and the

warnings did not convey adequate information on the dangers of AFFF Products containing these chemicals to the mind of a reasonably foreseeable or ordinary user or bystander.

225.    Despite the fact that Manufacturer Defendants knew or should have known about the risks of AFFF Products containing PFOS, PFOA, and/or their precursors, Manufacturer Defendants withheld such knowledge from Guam, regulators, and the public.    Moreover, Manufacturer Defendants affirmatively distorted and/or suppressed their knowledge and the scientific evidence linking their products to the unreasonable dangers they pose.

226.    At no time relevant to this action did Manufacturer Defendants warn users and buyers of their AFFF Products, Guam, and others who it was reasonably foreseeable would be harmed by AFFF Products, that Manufacturer Defendants' AFFF Products would release PFOS and/or PFOA into the environment during the products' normal use, and of the widespread, toxic, and persistent effects of such releases.

227.    Manufacturer Defendants' AFFF Products were in the same condition when they were purchased and/or used as they were when they left Manufacturer Defendants' control. Manufacturer Defendants' customers used the AFFF Products in a reasonably foreseeable manner and without any substantial change in the condition of the products.

228.    Had Manufacturer Defendants provided adequate warnings about the hazards associated with their AFFF Products containing PFOA, PFOS, and/or their precursors, users and buyers, Guam, and others who it was reasonably foreseeable would be harmed by the AFFF Products would have heeded those warnings.

229.    As a direct and proximate result of Manufacturer Defendants' failure to warn of the hazards of AFFF Products containing PFOS, PFOA, and/or their precursors, groundwater and other natural resources in Guam have become contaminated with PFOS and PFOA.

230.     As a direct and proximate result of Manufacturer Defendants' acts and omissions, Guam has incurred, is incurring, and will continue to incur in the future damages related to PFOS and PFOA contamination in an amount to be proved at trial.

231.     Manufacturer Defendants knew it was substantially certain that their acts and omissions described above would cause Guam's injury and damage.

232.     As long as Guam's natural resources remain contaminated with PFOS and/or PFOA due to Manufacturer Defendants' conduct, this injury and damage continues.

233.     Manufacturer Defendants are strictly liable for all such damages, and Guam is entitled to recover all such damages and other relief as set forth below.

234.     On information and belief, Corteva and New DuPont assumed Old DuPont's failure to warn liability described above.

## THIRD COUNT
### Negligence

235.     Guam incorporates by reference all allegations contained in the previous paragraphs.

236.     Manufacturer Defendants had a duty to Guam to ensure that PFOS and/or PFOA were not released as a result of the storage, handling, use, training with, testing equipment with, other discharge, and disposal of AFFF Products, and did not injure groundwater and other natural resources in Guam.

237.     Manufacturer Defendants had a duty to Guam to exercise due care in the design, manufacture, marketing, sale, testing, labeling, and instructions for use of their AFFF Products containing PFOS, PFOA, and/or their precursors.

238.     Manufacturer Defendants breached these duties.

239. As a direct and proximate result of Manufacturer Defendants' negligence in designing AFFF Products and in failing to warn AFFF Products purchasers, Guam, and others who it was reasonably foreseeable would be harmed by the dangers of Manufacturer Defendants' AFFF Products, groundwater and other natural resources in Guam, have become contaminated with PFOS and PFOA.

240. As a further direct and proximate result of the contamination of the environment from Manufacturer Defendant's AFFF Products containing PFOA, PFOS, and/or their precursors, Guam has incurred, is incurring, and will continue to incur investigation, clean up and removal, treatment, monitoring and restoration costs, and expenses for which Manufacturer Defendants are jointly and severally liable.

241. As long as Guam's natural resources remain contaminated with PFOS and/or PFOA due to Manufacturer Defendants' conduct, the harm to Guam continues.

242. On information and belief, Corteva and New DuPont assumed Old DuPont's negligence liability described above.

**FOURTH COUNT**
**Public Nuisance**

243. Guam incorporates by reference all allegations contained in the previous paragraphs.

244. Groundwater and other natural resources of Guam are held in trust by Guam. Pursuant to 5 GCA § 30110, the Attorney General has the authority to bring civil actions to abate public nuisances in Guam.

245. The contamination of groundwater and other natural resources in Guam as a result of the use of Manufacturer Defendants' AFFF Products is injurious to health, or is indecent or

offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, and is a nuisance pursuant to 20 GCA § 10101.

246.    The free use and enjoyment of uncontaminated natural resources of Guam is a right common to the people of Guam, and as such Manufacturer Defendants' conduct constitutes a public nuisance pursuant to 20 GCA § 10102.

247.    Manufacturer Defendants' conduct has further interfered with Guam's obligation to protect the natural resources of Guam, which are held by Guam in trust for the benefit of people of Guam.

248.    As long as Guam's natural resources remain contaminated with PFOS and/or PFOA due to Manufacturer Defendants' conduct, this public nuisance continues.

249.    Until these natural resources are restored, Manufacturer Defendants are liable for the creation, and continued maintenance, of a public nuisance in contravention of the people's common right to clean natural resources in Guam.

250.    Manufacturer Defendants knowingly created this public nuisance.  Manufacturer Defendants marketed AFFF Products to their customers, including Guam, knowing that use of their AFFF Products—exactly as marketed for intended use—would release PFOS or PFOA into the environment.  Further, well after Manufacturer Defendants understood the mobile, persistent, bioaccumulative, and toxic nature of PFOS and PFOA in the environment, Manufacturer Defendants never instructed their customers, including Guam, to stop using the AFFF Products in their possession or that they needed to specially dispose of AFFF Products so as to not further contaminate the natural resources of Guam.

251.    On information and belief, Corteva and New DuPont assumed Old DuPont's nuisance liability described above.

252.     Guam incorporates by reference all allegations contained in the previous paragraphs.

253.     Guam alleges violations by Manufacturer Defendants of 5 GCA § 32201(a) and (b).

254.     Manufacturer Defendants, as alleged and detailed above have, in the conduct of trade or commerce, engaged in false, misleading, or deceptive acts or practices in violation of 5 GCA § 32201(a) and (b) including but not limited to:

a.       Falsely representing that AFFF Products did not preset a threat to the environment or human health;

b.       Misrepresenting that AFFF Products did not contribute unsafe levels of PFOS and/or PFOA in the environment;

c.       Despite knowing the dangers associated with PFOS and PFOA contamination, withholding this knowledge from Guam, such that it did not understand the full consequences of its use of AFFF Products at the time of purchase and continuing after its use; and

d.       Selling AFFF Products to Guam, despite knowing that use of the AFFF Products would result in PFOS and/or PFOA contamination, and burden Guam with costs, including but not limited to investigation, clean up, and disposal of remaining stockpiles.

255.     Manufacturer Defendants, through their actions in: (1) making false representations and misrepresentations regarding the risks of PFOS and/or PFOA contamination related to use of AFFF Products, and (2) making such false representations and misrepresentation despite their

knowledge of the dangers associated with PFOS and/or PFOA, violated 5 GCA § 32201(a) and (b) by:

a.     Engaging in false, misleading or deceptive acts or practices in violation of 5 GCA § 32201(a).

b.     Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have, or that a person has sponsorship, approval, status, affiliation, or connection which he or she does not have, in violation of 5 GCA § 32201(b)(5).

c.     Representing that goods or services are of a particular standard, quality, or grade, or that goods of a particular style or model, if they are another, in violation of 5 GCA § 32201(c)(1).

d.     Failing to disclose information concerning goods or services which was known at the time of the transaction, if such failure to disclose such information was intended to induce the consumer into a transaction which the consumer would not have entered had the information been disclosed, in violation of 5 GCA § 32201(c)(17).

e.     Causing confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another, in violation of 5 GCA § 32201(b)(3).

256.     On information and belief, Corteva and New DuPont assumed Old DuPont's Deceptive Acts and Prohibited Practices Statute liability described above.

## SIXTH COUNT
**Actual Fraudulent Transfer in Relation to the Chemours Spinoff**
**(Old DuPont, Chemours, New DuPont, and Corteva)**

257.     Guam incorporates by reference all allegations contained in the previous paragraphs.

258. Guam is and was a creditor of Chemours at all relevant times.

259. Through its participation in the Chemours Spinoff, as detailed above, Chemours transferred valuable assets to Old DuPont, including the $3.9 billion dividend (the "Chemours Transfers"), while simultaneously assuming significant liabilities pursuant to the Chemours Separation Agreement (the "Chemours Assumed Liabilities").

260. The Chemours Transfers and Chemours Assumed Liabilities were made for the benefit of Old DuPont.

261. At the time that the Chemours Transfers were made and the Chemours Assumed Liabilities were assumed, and until the Chemours Spinoff was complete, Old DuPont was in a position to, and in fact did, control and dominate Chemours.

262. Chemours made the Chemours Transfers and incurred the Chemours Assumed Liabilities with the actual intent to hinder, delay and defraud the creditors or future creditors of Chemours.

263. Guam has been harmed as a result of the Chemours Transfers.

264. Under 20 GCA Sec. 6101 and 6103 and Del. Code. Tit. 6 Sec. 1301 to 1312, Guam is entitled to void the Chemours Transfers and to recover property or value transferred to Old DuPont.

265. On information and belief, Corteva and New DuPont assumed Old DuPont's liability for actual fraudulent transfers described above.

## SEVENTH COUNT
### Constructive Fraudulent Transfer in Relation to the Chemours Spinoff
### (Old DuPont, Chemours, New DuPont, and Corteva)

266. Guam incorporates by reference all allegations contained in the previous paragraphs.

267.     Guam is and was a creditor of Chemours at all relevant times.

268.     Chemours did not receive reasonably equivalent value from Old DuPont in exchange for the Chemours Transfers and Chemours Assumed Liabilities.

269.     Each of the Chemours Transfers and Chemours' assumption of the Chemours Assumed Liabilities was made to or for the benefit of Old DuPont.

270.     At the time that the Chemours Transfers were made and the Chemours Assumed Liabilities were assumed, and until the Chemours Spinoff was complete, Old DuPont was in a position to, and in fact did, control and dominate Chemours.

271.     Chemours and Old DuPont made the Chemours Transfers and assumed the Chemours Assumed Liabilities when Chemours was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business.

272.     Chemours made the Chemours Transfers and assumed the Chemours Assumed Liabilities when it was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business.

273.     Chemours was insolvent at the time or became insolvent as a result of the Chemours Transfers and its assumption of the Chemours Assumed Liabilities.

274.     At the time that the Chemours Transfers were made and Chemours assumed the Chemours Assumed Liabilities, Old DuPont and Chemours intended Chemours to incur, or believed, or reasonably should have believed that Chemours would incur debts beyond its ability to pay as they became due.

275.     Guam has been harmed as a result of the Chemours Transfers.

276. Under to 20 GCA Sec. 6101 and 6103 and Del. Code. Tit. 6 Sec. 1301 to 1312, Guam is entitled to void the Chemours Transfers and to recover property or value transferred to Old DuPont.

277. On information and belief, Corteva and New DuPont assumed Old DuPont's liability for constructive fraudulent transfers described above.

## EIGHTH COUNT
### Actual Fraudulent Transfer in Relation to Dow-DuPont Merger and Subsequent Restructurings, Asset Transfers and Separations
### (Old DuPont, New DuPont and Corteva)

278. Guam incorporates by reference all allegations contained in the previous paragraphs.

279. Guam is and was a creditor of Old DuPont at all relevant times.

280. Through its participation in the Dow-DuPont Merger, and through the separations of New DuPont, New Dow, and Corteva, Old DuPont sold or transferred, directly or indirectly, valuable assets and business lines to Corteva and New DuPont (the "Old DuPont Transfers").

281. The Old DuPont Transfers were made for the benefit of New DuPont or Corteva.

282. At the time that the Old DuPont Transfers were made, New DuPont was in a position to, and in fact did, control and dominate Old DuPont and Corteva.

283. Old DuPont, New DuPont, and Corteva acted with the actual intent to hinder, delay and defraud creditors or future creditors.

284. Guam has been harmed as a result of the Old DuPont transfers.

285. Old DuPont engaged in acts in furtherance of a scheme to transfer its assets out of the reach of parties such as the Guam that have been damaged as a result of the actions described in this First Amended Complaint.

286.     Under 20 GCA Sec. 6101 and 6103 and Del. Code. Tit. 6 Sec. 1301 to 1312, Guam is entitled to void the Old DuPont Transfers and to recover property or value transferred to New DuPont and Corteva.

## NINTH COUNT
### Constructive Fraudulent Transfer in Relation to Dow-DuPont Merger and Subsequent Restructurings, Asset Transfers and Separations
### (Old DuPont, New DuPont and Corteva)

287.     Guam incorporates by reference all allegations contained in the previous paragraphs.

288.     Guam is and was a creditor of Old DuPont at all relevant times.

289.     Old DuPont did not receive reasonably equivalent value from New DuPont and Corteva in exchange for Old DuPont Transfers.

290.     Each of the Old DuPont Transfers was made to or for the benefit of New DuPont or Corteva.

291.     At the time that the Old DuPont Transfers were made, New DuPont was in a position to, and in fact did, control and dominate Old DuPont and Corteva.

292.     Old DuPont made the Old DuPont Transfers when it was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business.

293.     Old DuPont was insolvent at the time or became insolvent as a result of the Old DuPont Transfers.

294.     At the time that the Old DuPont Transfers were made, Old DuPont intended to incur, or believed, or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

295.     Guam has been harmed as a result of the Old DuPont Transfers.

296. Under to 20 GCA Sec. 6101 and 6103 and Del. Code. Tit. 6 Sec. 1301 to 1312, Guam is entitled to void the Old DuPont Transfers and to recover property or value transferred to New DuPont and Corteva.

## PRAYER FOR RELIEF

**WHEREFORE**, Guam prays that the Court award judgment in its favor as follows:

1. Finding Defendants liable for all costs to investigate, clean up and remove, restore, treat, monitor, and otherwise respond to PFOS and PFOA contamination resulting from Manufacturer Defendants' AFFF Products, so the contaminated natural resources are restored to their original condition, and for all damages to compensate the residents of Guam for the lost use and value of these natural resources during all times of injury caused by PFOS and PFOA, and for such orders as may be necessary to provide full relief to address the threat of contamination to Guam, including the costs of:

a. Past and future testing of natural resources at and around sites in Guam where Manufacturer Defendants' AFFF Products were stored, handled, used, trained with, tested equipment with, otherwise discharged, and disposed of in Guam, and thus likely caused PFOS and/or PFOA contamination;

b. Past and future treatment of all natural resources at and around sites in Guam where Manufacturer Defendants' AFFF Products were stored, handled, used, trained with, tested equipment with, otherwise discharged, and disposal of and which contain detectable levels of PFOS and/or PFOA until restored to non-detectable levels; and

c. Past and future monitoring of Guam's natural resources at and around sites in Guam where Manufacturer Defendants' AFFF Products were stored, handled, used, trained with, tested equipment with, otherwise discharged, and as long as there is a

detectable presence of PFOS and/or PFOA, and restoration of such natural resources to their pre-discharge condition.

2. Ordering Defendants to pay for all costs related to the investigation, cleanup, restoration, treatment, and monitoring of PFOS and/or PFOA contamination of Guam's drinking water and other natural resources resulting from Manufacturer Defendants' AFFF Products.

3. Ordering Defendants to pay for all damages in an amount at least equal to the full cost of restoring Guam's natural resources to their original condition prior to the PFOS and/or PFOA contamination resulting from Manufacturer Defendants' AFFF Products.

4. Ordering Defendants to pay for all compensatory damages for economic damages and for the lost value (including lost use) of Guam's natural resources as a result of the PFOS and/or PFOA contamination resulting from Manufacturer Defendants' AFFF Products.

5. Ordering Defendants to pay for all other damages sustained by Guam in its public trustee and *parens patriae* capacities as a direct and proximate result of Defendants' acts and omissions alleged herein.

6. Ordering Defendants to reimburse Guam for its costs of abatement, without regard to fault, including but not limited to all costs to investigate, clean up, restore, treat, monitor, and otherwise respond to contamination of Guam's natural resources resulting from Manufacturer Defendants' AFFF Products so that such natural resources are restored to their original condition.

7. Compelling Defendants to abate the nuisance by investigating, cleaning up, restoring, treating, monitoring, and otherwise responding to contamination of Guam's natural resources resulting from Manufacturer Defendants' AFFF Products so that such natural resources are restored to their original condition.

8.      Ordering Defendants to pay civil penalties to the Consumer Protection Fund for each violation of 5 GCA § 32201(a) and (b) up to a total of $5,000 per each violation.

9.      Ordering Defendants to pay restitution to Guam.

10.     Ordering Defendants to disgorge all ill-gotten gains.

11.     Ordering the Chemours Transfers and Old DuPont Transfers void to the extent necessary to satisfy Guam's claims.

12.     Enjoining New DuPont from selling, distributing, transferring, capitalizing, or otherwise disposing of the business lines, segments, divisions, or other assets that formerly belonged to Old DuPont, and/or imposing a constructive trust over the proceeds of any such transactions for the benefit of Guam.

13.     Ordering Defendants to pay exemplary or punitive damages as the trier of fact deems just and proper.

14.     Ordering Defendants to pay punitive damages pursuant to 20 GCA § 2120.

15.     Ordering Defendants to pay Guam's attorneys' fees and costs of court.

16.     Granting Guam all other relief to which it is entitled.

## JURY DEMAND

Guam hereby requests a jury trial on all issues raised in this First Amended Complaint to the extent permitted by law.

Date: September 24, 2020                    Respectfully submitted,

**OFFICE OF THE ATTORNEY GENERAL**
**Leevin Taitano Camacho, Attorney General**

_/s/ Fred Nishihara_
Fred Nishihara, Deputy Attorney General
fnishihira@oagguam.org
Joseph A. Perez, Assistant Attorney General
jperez@oagguam.org
Janice Camacho, Assistant Attorney General

jcamacho@oagguam.org
590 S. Marine Corps Drive
Suite 802, ITC Building
Tamuning, GU 96913
Ph:  (671) 475-3324

**KELLEY DRYE & WARREN LLP**

  */s/ William J. Jackson*
William J. Jackson
bjackson@kelleydrye.com
John D.S. Gilmour
jgilmour@kelleydrye.com
Fabio Dworschak
fdworschak@kelleydrye.com
515 Post Oak Blvd., Suite 900
Houston, Texas 77027
Ph: (713) 355-5000

David M. Reap
dreap@kelleydrye.com
101 Park Avenue
New York, New York 10178
Ph: (212) 808-7800

Andrew W. Homer
ahomer@kelleydrye.com
7825 Fay Avenue, Suite 200
La Jolla, CA  92037
Ph: (858) 795-04

**SL ENVIRONMENTAL LAW GROUP**

Richard W. Head
rhead@slenvironment.com
Ashley B. Campbell
acampbell@slenvironment.com
175 Chestnut Street
San Francisco, CA 94133
Ph: (603) 716-8235

**TAFT STETTINIUS & HOLLISTER LLP**

Robert A. Bilott
bilott@taftlaw.com
David J. Butler

dbutler@taftlaw.com
425 Walnut Street, Suite 1800
Cincinnati, Ohio 45202-3957
Ph: (513) 381-2838

**DOUGLAS & LONDON, P.C.**

Gary J. Douglas
gdouglas@douglasandlondon.com
Michael A. London
mlondon@douglasandlondon.com
Rebecca G. Newman
rnewman@douglasandlondon.com
Tate Kunkle
tkunkle@douglasandlondon.com
59 Maiden Ln., 6th Fl.,
New York, NY 10038
Ph: (212) 566-7500

**LEVIN PAPANTONIO THOMAS MITCHELL
RAFFERTY & PROCTOR, P.A.**

Neil E. McWilliams, Jr.
nmcwilliams@levinlaw.com
Wesley Bowden
wbowden@levinlaw.com
316 South Baylen St.
Pensacola, FL 32502
Ph: (850) 435-7184

**KENNEDY & MADONNA, LLP**

Kevin Madonna
kmadonna@kennedymadonna.com
48 Dewitt Mills Road
Hurley, NY 12443
Ph: (845) 481-2622

*Attorneys for the Government of Guam*